**COLEMAN v. MILLER et al.** (No. 10219.)

Court of Civil Appeals of Texas. Dallas.
May 7, 1929.

Rehearing Denied July 6, 1929.

830

Cockrell, McBride, O'Donnell & Hamilton, of Dallas, for appellant.

Hamilton, Frank & Hamilton, of Dallas, and A. D. Sanford, of Waco, for appellees.

JONES, C. J. In a suit instituted in a district court of Dallas county by F. W. Coleman, appellant, and H. N. Rogers, against appellees, C. R. Miller and C. R. Miller Manufacturing Company, a private ·corporation, judgment was rendered on a verdict of a jury on. special issues, in favor of appellant for $1,063.93, against C. R. Miller Manufacturing Company and in favor of C. R. Miller. No judgment was rendered in favor of Rogers, as he had, previous to the trial, compromised and settled his alleged part of the cause of action. Judgment was also rendered in favor of appellant on the cross-action of C. R. Miller Manufacturing Company. Rogers is not a party to this appeal.

For convenience, Coleman will be referred to as appellant, appellee C. R. Miller by name, and appellee C. R. Miller Manufacturing Company as the Miller Company.

During the time under inquiry, appellant and Rogers were doing business as copartners, under the trade-name of Textile Finance Company, hereafter referred to as Finance Company. The Miller Company was chartered May 13, 1919, wtih a capital stock of $1,750,000, divided into shares of the par value of $100, of which shares, 15,000 represented common stock and 2,500 preferred stock. It operated a large manufacturing plant in the city of Waco, with this as its capital stock for approximately five years. In the summer of 1924, an amendment to the charter was authorized by the board of directors and secured from the state, increasing its capital stock to $3,250,000, by the issuance of 15,000 new shares of stock, of the par value of $100 each. At this time, the Miller Company had been a solvent and going institution for more than two years—in fact, from the time it opened business in 1919. C. R. Miller was president and general manager of the Miller Company. In order to consummate the purpose of this amendment to the charter, and to realize in money the par value of the increased issue of stock, Miller, as manager, at once began negotiations with appellant and Rogers to conduct a sale of the new issue of stock. An agreement between the parties was consummated, appellant and Rogers contracting under their trade-name of Textile Finance Company. The final draft of the written contract was made and executed on September 22, 1924, and this contract in part forms the basis of this suit. This contract on its face recited that the Finance Company had become the purchaser of 14,250 shares of the common stock of the Miller Company at the value of $100 per share. This purchase represented all but 750 shares of the increase of capital stock, such remaining shares being subscribed for by C. R. Miller. No portion of the recited purchase price of these shares was paid in cash by the Finance Company and no shares were then issued to it. The plan, as understood and acted upon by the parties, was that the Finance Company was to sell these allotted shares of stock to other purchasers as the property of said company, and when shares were sold and fully paid for by the purchaser, they would be issued either to the purchaser direct, or to the Finance Company, to be transferred to the purchaser.

In January, 1925, the Miller Company decided to purchase cotton mills in the cities of Dallas and McKinney and to pay therefor by a further increase of its capital stock, from $3,250,000 to $6,000,000, such increase in capital stock to be accomplished by the issuance of 27,500 new shares of stock, each share to be of the par value of $100, 13,780 shares of which to represent common stock and 13,720 shares to represent preferred stock. The charter was duly amended and the contemplated increase of stock authorized. Appellant alleged in his petition that an oral agreement was entered into between the Miller Company and the Finance Company, under which the Finance Company should have the right to sell 17,000 shares of this latest issue of stock, on the same terms of the existing contract. This alleged oral agreement also in part forms the basis of this suit.

The petition alleged a breach by the Miller

Company, both of the September contract and the alleged oral contract, in that the completion by the Finance Company of these contracts was rendered impossible because of the wrongful and unauthorized conduct of Miller and the Miller Company. The allegations in reference to this alleged conduct of appellees, set out at length and in specific terms the acts and conduct of the parties constituting the alleged wrongful conduct in this respect. Briefly stated, the effect of these allegations is to charge Miller, as the manager, and the Miller Company, of disorganizing the large sales force the Finance Company had organized and which was necessary for it to complete the sale of this stock within the contract time; and, further, that the Miller Company, in violation of the contract, organized a sales force of its own and began an active campaign of its own to sell the stock the Finance Company had been given the exclusive right to sell; that in organizing its own sales force, the Miller Company wrongfully induced many members of the Finance Company's sales force to quit its employment and take employment from the Miller Company to sell this stock, and that by reason thereof the Finance Company was denied by appellees the right to complete the contract, at a time when, by the expenditure of large sums of money in perfecting its organization and in advertising the stock, and in interesting the purchasing public in the buying of this stock, the Finance Company was certain of full performance of the contract and of reaping the full benefit therefrom. Damages are claimed because of the alleged loss suffered by this breach.

In addition to this claim for damages, the petition also alleged the failure by the Miller Company to pay to the Finance Company earned commissions in a sum in excess of $40,000, collected from purchasers of stock on a deferred payment plan, which was due the Finance Company for unpaid commissions on such sales. Claim is further alleged against the Miller Company for reimbursement under the contract for a sum not exceeding $20,000 for advertising expenses incurred by the Finance Company.

Appellees filed very elaborate pleadings in answer to appellant's petition. These answers deny any wrongful conduct, as alleged by the Finance Company, that could have hindered or prevented it from carrying out the September contract, or that the contract was breached in any particular by the Miller Company. Appellees alleged that the Finance Company breached the contract by voluntarily abandoning any attempt to complete same. Appellees denied that the Miller Company ever contracted with the Finance Company to sell any of the latest issue of stock, and that in reference to such issue of stock no contract relations existed between the said companies. The Miller Company also denied that any sum is due the Finance Company for commissions alleged to be withheld by it, but, on the contrary, that under the terms of the contract, the Finance Company had collected an excess of commissions on sales of stock made by it; that this excess is approximately $17,500, and the Miller Company filed a cross-action over against the Finance Company to recover such amount. The allegations of the respective answers are full and complete and show on their face no right of damages and no overdue commissions, as alleged by appellant. The allegations of the cross-action will be discussed later.

The Miller Company further defends this claim, on the ground that, the September contract being voluntarily abandoned by the Finance Company, suit did not lie on the contract for recovery of the alleged unpaid commissions. The Miller Company also claims in its answer that the suit attempted to be prosecuted by appellant could not be maintained, because the alleged contracts forming the basis of this suit are in direct violation of the Blue Sky Law (Rev. St. 1925, arts. 579–600), and that such contracts, if entered into, were void and could not be made the basis for this suit. After the settlement was consummated with Rogers, appellees filed a plea in abatement, on the ground that the suit could not be continued against them in the names of appellant and Rogers after such settlement, but that appellant, if he desired to pursue his alleged cause of action, could do so by filing a new suit in his name only. This plea was overruled. Rogers also filed a plea alleging his settlement with appellees, and praying that he be dismissed from this suit. This plea was denied.

The case was submitted to the jury on special issues and findings made thereon. The findings material to the questions to be discussed are: (1) That the Miller Company was indebted to appellee in the sum of $1,063.93 as his one-half interest in the commission on the sale of stock under the contract of September, 1924; (2) that no later contract was entered into with the Finance Company to sell any portion of the increase of stock to $6,000,000; (3) that the Miller Company, acting through C. R. Miller, did not wrongfully prevent the Finance Company from completing sale of the issuance of stock covered by the September contract; (4) that C. R. Miller did not wrongfully cause the Miller Company to prevent the Finance Company from completing the sale of stock under the September contract; (5) that the Finance Company failed to perform the September contract before the final sale of all stock therein agreed to be sold by it; (6) that the Finance Company ceased efforts to market the stock covered by the September contract about the middle of June; (7) that misrepresentations were made by salesmen of the Finance Company to purchasers of stock under the Sep-

tember contract; (8) that the Miller Company suffered no damages by reason of such misrepresentations. Under these findings, the court entered the judgment above described.

Numerous errors are assigned by appellant to the action of the court in refusing to sustain special exceptions directed to allegations in the answers of appellees. Error on the finding of the jury as to the amount of money due appellant on his claim for commissions alleged to be withheld, because (1) it is unsupported by evidence, and (2) it is supported by insufficient evidence. Also numerous assignments on the ruling of the court on the admission of evidence during the trial of the case, and assignment of error on alleged improper argument of counsel for appellees. There are also assignments of error on practically each adverse finding of the jury, as well as assignments on the manner in which certain issues were submitted, and on the refusal of the court to submit these issues in the form requested by appellant.

Appellees have filed cross-assignments of error on the refusal of the court to give their requested peremptory instructions, because of the illegality of the two contracts, and further because of the finding of the jury to the effect that the failure of the Finance Company to complete the September contract was due to voluntary abandonment, for which appellees were blameless, and as the suit for recovery of commissions withheld is based solely on this contract, no recovery for such commissions could be had, and judgment should have been entered for appellees.

Under our construction of the September contract, which construction the parties thereto adopted in their dealings with each other, the Finance Company was given the exclusive right to sell 14,250 shares of the 1924 issue of stock upon the following conditions: (1) The stock to be sold at $130 per share and sold as the stock of the Finance Company; (2) of this purchase price, the Finance Company should receive $30 per share and the Miller Company $100 per share; (3) the Finance Company to bear all expenses of sale, including advertising, except that, on the completion of the contract, the Miller Company would pay to the Finance Company the sum of $20,000 as part of the advertising expense; (4) the Finance Company to assume all responsibility with a purchaser of stock, of any claim arising out of such purchase and, in effect, the Miller Company to be exempt from liability on any such claim; (5) the Finance Company must sell the stock, either for cash or for one-half cash and the remainder by the execution by the purchaser to the Miller Company, as payee, of short-time note or notes; (6) stock paid for in cash by the purchaser to be at once issued by the Miller Company, either to the purchaser or to the Finance Company, and transferred by the Finance Company to such purchaser; (7) no

stock to be issued to the purchaser when notes were issued for deferred payments until such payments were made, when all of the stock purchased would be issued in the same manner as to a purchaser for cash; (8) if the Finance Company contracted with a purchaser for the sale of stock for one-half cash and one-half on deferred notes, $40 on each share of stock so sold, together with the notes for deferred payments, to be delivered at once to the Miller Company and the remainder, or $20 per share, of the cash payment to be retained by the Finance Company; the Miller Company to remit the balance of $10 per share to the Finance Company when the stock was issued; (9) the September contract to be completed by July 1, 1925.

This contract is made up of the original draft executed September 19, 1924, and by additions made to comply with the agreement actually entered into between the parties. These additions consist of a supplemental contract and of a letter written to the Finance Company by Miller, as manager of the Miller Company, further supplementing the contract.

It was further stipulated in the contract that: "If the Textile Finance Company should violate any of the provisions of this contract, that party of the first part (The Miller Company) will have the right to immediately cancel and terminate this contract by simply giving party of the second part (Textile Finance Company) notice to that effect, and it is agreed and understood that, if party of the second part, in re-selling the stock hereinbefore mentioned, should fail to comply with the laws of this State, then in such event, party of the first part will have the right to terminate this contract by giving notice in writing to party of the second part to that effect."

On September 22, 1924, the Miller Company received, on its application, from the secretary of state, "Exemption No. 154," which is as follows:

"Exemption No. 154:
"Department of State, Blue Sky Division, the State of Texas
"Know all men by these presents:
"That C. R. Miller Mfg. Company, Waco, Texas, a domestic corporation chartered under the laws of the State of Texas on the 31st day of May, 1919, under the name of Miller Cotton Mills, having at this time an authorized capital stock of $1,750,000.00, divided into shares of the par value of $100.00 per share; 2500 shares of said stock being preferred stock and 15000 shares of said stock being common stock, said corporation being chartered for the following purposes, to wit:
" 'The transaction of a manufacturing business, to wit: the manufacture of cotton goods, particularly cotton piece goods, and the purchase and sale of goods, wares and merchandise used for such business,' has filed with

the Secretary of State of the State of Texas, an application with its accompanying documents and exhibits, asking for an Exemption from the requirements of the Blue Sky Law of this State for the issuance and sale of 15000 shares of the par value of $100.00 per share, for the purpose of increasing the capital stock of said corporation from $1,750.000.-00 to $3,250,000.00, said increase in said stock to be sold at the par value of $100.00 per share, no commissions to be paid for the sale of the stock, and all other sales expense for the sale thereof not to exceed 5% upon the sales price of said stock, and no amount of said stock to be issued for promotion, compensation or other purposes except for value.

"Now, therefore, I, J. J. Strickland, Secretary of State of the State of Texas, do hereby certify that said application and its accompanying exhibits have been examined and upon full consideration thereof, do hereby grant an exemption from the requirements of said law to the said C. R. Miller Mfg. Company, to offer for sale and sell 15000 shares of common stock of the par value of $100.00 per share, to be sold at the price of $100.00 per share for the purpose of increasing said capital stock of said corporation from the sum of $1,750,000.00 to $3,250,000.00, no commissions to be paid for the sale of said stock, and all other sales expense for the sale thereof not to exceed 5% upon the sales price of said stock, and no amount of said stock to be issued for promotion, compensation or other purposes except for value. The sale of said stock to be made and conducted in all things in accordance with the Constitution and laws of the State of Texas, the Blue Sky Law thereof, said application and this exemption granted thereon. This exemption is permissive only and no recommendation is hereby made of said stock.

"In testimony whereof, I have hereunto signed my name officially and have caused to be impressed hereon the Seal of State at my office in the City of Austin, Texas, this the 22nd day of September, A. D., 1924.
"[Seal]   (S)         J. J. Strickland,
                "Secretary of State."

On February 9, 1925, after the second charter amendment, increasing the capital stock to $6,000,000, on the application of the Miller Company, the secretary of state issued "Exemption No. 154–A." This exemption is worded similarly to the one above copied, except that it makes the necessary change in the amount of the capital stock of the Miller Company, and recites that it had filed an amendment to its charter increasing its capital stock to $6,000,000, and recites the character of stock to be issued, giving the amount of preferred stock and the amount of common stock. In all other respects, this exemption is the same as the previous one. On the 8th day of June, 1925, the secretary of state, on

application of the Miller Company, issued "Exemption 154–C," which is as follows:

"Exemption No. 154–C
"Department of State, Blue Sky Division, the State of Texas
"Know all men by these presents:
"That C. R. Miller Mfg. Company, a corporation chartered under the laws of the State of Texas on the 31st day of May, 1919, and having received Exemption No. 154–A under the Blue Sky Law from the Secretary of State of Texas, on the 9th day of February 1925, for the sale of 13780 shares of common stock and 13720 shares of preferred stock, to be sold at the par value of $100.00 per share, the purpose of said sale being to increase the capital stock of said company from $3,250,000.00 to $6,000,000.00, has filed in the office of the Secretary of State of the State of Texas an application for the privilege of selling the unsold portion of said 13780 shares of common stock at a price of $130.00 per share.

"Now, therefore, I, D. A. Gregg, Acting Secretary of State of the State of Texas, do hereby certify that said application and its accompanying documents and exhibits have been examined, and upon full consideration thereof, do hereby grant to the said C. R. Miller Mfg. Company the privilege of selling the unsold portion of said 13780 shares of common stock at a price of $130.00 per share; the commissions for the sale of said stock not to exceed $15.00 per share. This exemption is permissive only, and no recommendation is hereby made, or is intended to be made of said stock.

"In testimony whereof, I have hereunto signed my name officially, and caused to be impressed hereon the Seal of State at my office in the City of Austin, Texas, this the 8th day of June, A. D., 1925.
                "[Signed]   D. A. Gregg,
                "Acting Secretary of State."

The evidence conclusively shows that the Finance Company, on the execution of the September contract, at once organized a large sales force and went diligently to work to execute this contract; that a large amount of literature, advertising this stock, was printed and mailed to many parties over the state, whose adresses had been secured from the tax lists of the different counties; and that there had been sold by the Finance Company approximately 12,500 shares of stock under the September contract, at the time the Finance Company ceased operations. The Finance Company, under the approval of C. R. Miller, as manager of the Miller Company, used the following printed form of application, which form was signed by all purchasers of stock and constituted the written contract between the Finance Company and the purchaser of stock:

"Purchasing Contract for Capital Stock of the C. R. Miller Mfg. Co.

"No. 417        No. Shares ——

"Incorporated under the laws of the State of Texas.

"Authorized Capital, $3,250,000.00.

"General Office:        Cotton Mills:
"Dallas, Texas.        Waco, Texas.

"Par Value $100.00  Sale Price $130.00 per share

"I hereby apply to the Textile Finance Co. of Dallas, Texas, and subscribe for and agree to accept upon delivery —— shares of the capital stock of the C. R. Miller Mfg. Co. Par Value $100.00, Sale Price $130.00 per share, payable as follows: Not less than one-half cash, accompanying this application, and the balance thereof, as evidenced by my promissory note of this date.

"It is further understood that no stock shall be delivered to the purchaser until the agreed consideration therefor is paid in full in cash and any payment becoming due on the stock hereby purchased for any note given for said stock, not paid within sixty days after due, shall at the option of the seller cause this contract and note or notes given therefor to become null and void and all payments made on the contract by the purchaser shall become the property of the seller absolutely as liquidated damage for the failure of the purchaser to carry out his contract.

"This contract may be rejected by refunding all moneys paid thereon, also contains the entire agreement and no agent or representative of the seller or any other person has any power to change or alter the terms of this contract.

"This stock is owned by the Textile Co. and the C. R. Miller Mfg. Co. is in no way party to this contract.

"Dated this —— day of ——, 1924.
      "——————, Representative.
      "——————, Purchaser.

"Name, —————— (Print in name of Subscriber)

"Address: —— County —— State —— Occupation ——.

"Received of —— of —— the sum of —— Dollars Cash $——
                Notes ——

"It is agreed for the convenience of the seller of said shares of stock that all checks, drafts or money orders must be made payable to the C. R. Miller Mfg. Company.

"Textile Finance Co., 205 Magnolia Bldg., Dallas, Texas."

After the second amendment of the Miller Company's charter, increasing the capital stock to $6,000,000, another form of purchasing contract was prepared under approval of Miller, and used by the Finance Company, as the contract of purchase between such company and the purchaser of the stock. This was substantially as the form above copied, except the authorized stock is given as $6,000,000.

The evidence further shows that the sale of the stock increased month by month until about in May, 1925, when the dispute came up between the parties as to the right of the Finance Company to sell the new issue of stock under the alleged oral contract.

The evidence further discloses that in the early part of June, 1925, the Miller Company began the organization of a sales force for the disposition of the unsold portion of its stock, and a number of salesmen who had been in the employ of the Finance Company left such employment and accepted similar employment with the Miller Company. After this had occurred, the Finance Company, claiming that the Miller Company had violated the terms of the agreement and had destroyed its sales force, ceased its attempt to complete the September contract. From this arose the conflicting claim as to which party breached the contract. The evidence of this conflicting issue is voluminous, and we will not further refer to same, except to state that the finding of the jury that the Finance Company breached the contract is sustained by substantial evidence.

The evidence, as to the oral contract for the sale of shares of the new issue, is conflicting. Appellant testified positively to the making of such an agreement, and introduced in evidence newspaper advertisements, which appeared in Dallas newspapers shortly after the time he claimed the oral contract was consummated. These advertisements contained subject-matter consistent only with appellant's claim that such contract was made. Appellant testified in positive terms that these advertisements, as they appeared in the papers, were submitted to Miller as president and manager of the Miller Company, and approved by him. The securing of the second exemption for the sale of new stock to be issued, above referred to, by the Miller Company to the precise effect as the one secured under the former amendment to the charter, also tends to corroborate appellant's claim in this respect.

On the other hand, Miller in positive terms denied the making of such a contract with the Finance Company, and in this he is corroborated by the testimony of Rogers and by the testimony of other witnesses. Miller testified that the advertisements, as they appeared in the Dallas newspapers, were not the advertisements that he had approved, claiming that the matter which tended to show that the Finance Company had the right to sell this new issue of stock was inserted after his approval. The fact as to whether there was such a second contract between the parties became, therefore, a sharply contested issue for the jury to determine, and the finding that there was no such

contract entered into is supported by substantial evidence.

In our opinion, the finding of the jury in favor of appellant for the sum of $1,063.93, as appellant's interest in the amount of money withheld on sales of stock that had been made, is entirely without support in the evidence. It is our opinion that the evidence as a whole conclusively shows that there was due and owing to the Finance Company, on commissions it had earned from sales of stock, which commissions the Miller Company had collected from purchasers of stock on deferred payments, the sum of $20,785, of which sum appellant's interest is $10,392.50, and the verdict should have been in such an amount. Other facts will appear in the discussion of the issues involved on this appeal.

It is appellees' theory that appellant neither by pleading, nor by proof, presented a cause of action upon which a valid judgment in favor of appellant could be rendered. This theory is based upon the contention that, both by pleading and by proof, appellant disclosed that the alleged contracts upon which his recovery is based are void, because the subject-matter of both alleged contracts is in violation of law, and the courts will not adjudicate disputes between parties to a contract made in violation of law.

This contention is based upon certain provisions of our Blue Sky Law, which appellees charge were violated by the terms of the alleged contracts. The September contract binds the Finance Company to sell each share of stock for $130 per share, and allows such company upon each sale of a share of stock the sum of $30, and the Miller Company is allowed on such sale the sum of $100, or the par value of the share of stock sold. A specific claim is made that this is in violation of article 583 of the Blue Sky Law, which declares that: "Commissions for the sale of stock and other securities, promotion, and all other incidental expenses shall not, in the aggregate, exceed twenty per cent of the price at which the stock or other securities are to be sold, as shown by the application or amended application."

That, under the contract pleaded by appellant and introduced in evidence, the commission allowed was, in itself, in excess of the statutory maximum for all expenses of sale, including commissions. It is also claimed that the instrument issued by the secretary of state and styled by that officer "Exemption 154" does not exempt the sale of this stock from the provisions of the Blue Sky Law, and was not issued under the provisions of article 588, prescribing the conditions under which such an exemption is allowed, but that such instrument shows on its face that it was issued under the provisions of article 580, which required the Miller Company to secure a permit to sell its stock; that under a provision of said article, the

Miller Company was required to state the price for which its stock would be offered for sale, and the commission to be paid to any agent for the selling of such stock; that in compliance with this provision, the Miller Company, in the application made, represented that the stock would be sold at $100 per share, and that the entire expense for such sale would not be in excess of 5 per cent., and that on this condition the secretary of state issued a permit, erroneously styled by such officer "an exemption"; that the contract showed on its face to be in violation of the condition on which the permit was issued.

In conformity to this contention, appellees requested peremptory instructions in their favor, duly objected to the submission of any issues to the jury, filed motion for judgment notwithstanding the verdict of the jury on special issue No. 1, and have duly presented cross-assignments of error.

Were the operations of the parties, under the alleged contracts, in violation of the Blue Sky Law? This law, as it existed at the time of inquiry, was enacted in 1923, at the Second Called Session of the Thirty-Eighth Legislature, and is chapter 52, page 114, of the Acts of said session, and in the Revised Statutes of 1925 is title 19, consisting of articles 579–600, inclusive. The purpose of this act, as shown by its caption, is "to regulate and supervise and prevent fraud in the sale, purchase and disposition in the State of Texas of stocks, stock certificates, bonds, debentures or other securities, and the transaction of business in this State of persons, joint stock companies, brokers, agents, co-partnerships or other companies, individuals or other organizations, offering for sale or selling in this State. * * *" This purpose is further shown by the emergency clause: "The fact that Texas has in recent years been flooded with worthless securities, issued and sold by irresponsible parties to the people of this State, resulting in great loss to investors, especially wage earners, a class least able to stand such losses, and the fact that many companies have organized and made their domicile, or home office in this State, and sold worthless securities through the mails and otherwise, to people in other states by reason of inadequate laws in this State, calls for the enactment of laws to protect the citizens of Texas from such wastes and impositions." Section 29 of the Original Act.

The purpose of this law is effectuated by the enactment of section 2 of the original act and is now article 580, Rev. St. 1925, and reads:

"Every concern which shall hereafter be formed or created or which shall hereafter attempt to increase its capital stock or commence the transaction of business in this State, shall before offering for sale, directly or indirectly, through itself, its agents or employés, or through any holding company,

sales company or any character of person or association, whether herein defined or not, any stock as defined in the preceding article, and before transacting any business in this State, except the preparation of instruments hereinafter mentioned and other instruments relative to the organization and transaction of business thereof, file in the office of the Secretary of State, together with a fee equal in amount to the filing fee of a private corporation having capital and surplus of like amount, the following: (This requirement as to fees shall not apply to corporations, by reason of the existing requirement as to the payment of filing fees upon obtaining charters and permits from the Secretary of State). .

"1. An application for a permit to sell any of the securities mentioned herein, or any other securities offered, or to be offered for sale, and for the transaction of any and all other business in this State. Said application must show the name under which such business is to be conducted, its location and general purpose, the age, occupation and general qualifications of such trustees or managing officers, and also fully the business in which each has been engaged for the last five years immediately preceding the filing of such application.

"2. A copy of its articles of association, partnership agreement, constitution, by-laws, or any other contract, agreement or other form of organization under which business is to be transacted, and all amendments thereto, showing the county or counties in which such instruments are filed, or to be filed for record.

"3. Copies of stock certificates, bonds, debentures, or other securities offered, or to be offered for sale, or other disposition, together with copies of application blank for such securities. Such application must show the capital stock, par value of such stock, the price at which the same is to be sold, the commissions to be paid for the sale thereof, the amount of such stock or other interest therein issued, or to be issued for promotion, compensation, or other purposes.

"4. A detailed statement showing the assets and liabilities of such issuer, together with a profit and loss statement. (Id.)"

This article is mandatory in its provisions and requires every concern, created after the enactment, or which shall hereafter attempt to increase its capital stock, before transacting any business in this state, and before offering for sale any shares of stock, to file in the office of the secretary of state an application for a permission to sell such stock, and such application, among other things, "must show the capital stock, par value of such stock, the price at which the same is to be sold, the commissions to be paid for the sale thereof, the amount of such stock or other interest therein issued, or to be issued for promotion, compensation, or other purposes."

Article 583 provides that, before the permit to sell stock provided for under this article shall be given, the application must show that "commissions for the sale of stock and other securities, promotion, and all other incidental expenses shall not, in the aggregate, exceed twenty per cent. of the price at which the stock or other securities are to be sold." It is manifest, therefore, that if the increase of the capital stock of the Miller Company, contracted to be sold by the Finance Company, is controlled by these provisions of the Blue Sky Law, then the contract and other transactions with reference to the sale of this stock by the parties hereto was illegal and the contract void. This because the application to the secretary of state did not show the sale price for which this stock was to be offered the public, and the contract provided for a commission in excess of 20 per cent. of the sales price.

The controlling question, then, is: Was the Miller Company in its sale of the increased issue of stock authorized by its amended charter, subject to statutory restrictions of the Blue Sky Law, above quoted, in marketing such stock? This must be determined from the provisions of this law. Section 6a of the original act reads: "In order to avoid undue restrictions upon the handling of stock, as the term stock is defined in Section 1, hereof, of solvent concerns, it is provided that any concern which has been a solvent going concern for a period of two years next preceding the date of any application named in this section, may submit to the Secretary of State satisfactory evidence of such fact and of its present sound solvent condition; whereupon the Secretary of State shall consider the same and shall require such further evidence, and may make such independent investigation as he may deem proper, concerning such matter. If upon full consideration thereof he shall conclude that such concern has been a solvent going concern for a period of two years and is at present solvent, he shall enter such finding upon his record, whereupon the proposed issue and sale of such stock, debentures or other securities as in this Act defined of such concern shall be exempted from the general requirements of this Act."

This section, with the omission of the introductory clause, "In order to avoid undue restrictions upon the handling of stock, as the term stock is defined in Section one, hereof, of solvent concerns, it is provided that, * * *" is article 588, Rev. St. 1925. The omitted words show the purpose of the Legislature in enacting article 588, and such purpose undisputably is to exempt from the terms of the Blue Sky Law sales of stock of a "concern" which may qualify under the requirements of such article. The exemption issued shows that the Miller Company did qualify under the requirements of this article, and it then became the duty of the secretary

of state officially to declare the exemption. Exemption 154 shows that this duty was performed by such officer. It is argued that, because the exemption states that the Miller Company would receive $100 for each share of stock sold, the instrument was not an exemption, but was a permit and restricted the Miller Company and its agents from contracting with an investor for any excess of $100 per share in the sale of the stock placed on the market. We cannot accept this theory. We think that in any application for an exemption from the Blue Sky Law of a concern entitled to such exemption, it should be made known to the secretary of state, as bearing on the question of its solvency, how much would be realized by such concern claiming the right of exemption on its new issue of stock. To illustrate by the instant case, the amended charter shows that the capital stock was to be increased to $3,250,000, an increase of $1,500,000, on the basis of the par value of the shares. If these shares of stock were to be sold at a price from which there would be realized less than the par value, then the actual value of the capital stock would be less than $3,250,000, and to some extent might affect its solvency, because of the decreased value of its capital stock; so to give the secretary of state assurance that there would be no such decrease in value, the representation was properly made, in the application for an exemption, that the Miller Company would receive approximately the par value of its new issue of stock. If the exemption was issued on the faith of this promise, there is no claim that it was in any way violated.

The Miller Company had been chartered in 1919, and the record before us conclusively shows that it had been a solvent and going concern during all this time, and that it received, without expense to it, the full par value of the stock sold under the contracts whose legality is attacked. There was no violation of the exemption by the entering into, and the execution of, this contract. It is also a clear inference from the contract that the Miller Company believed its business success and its stability were such to warrant a large increase in the market value of its shares of stock over the par value, and in order to accomplish this purpose it would require an expensive advertising campaign, as well as an organization of a large sales force, in order that the merits of an investment in the stock might be placed before the investing public.

The undisputed evidence shows that the Finance Company put on such a campaign, organized such a force, and succeeded in realizing the hopes of the Miller Company to such an extent, that, in applying for its third exemption, the Miller Company was able to state that it would receive, above all expenses of making the sales of the large second increase of capital stock, the net sum of $115

per share. The Blue Sky Law was not enacted to prevent a successful business institution, such as the Miller Company, from realizing the full benefit of its success in the business world. This clearly appears from section 6a of the original act, now article 588.

We therefore conclude, that the Miller Company, in entering into the September contract and a similar contract, as appellant alleges was entered into in February, 1925, was exempt from the operation of the Blue Sky Law.

Appellant has assigned 83 errors, on which he urges a reversal of this cause; a number of them refer to the same subject-matter, and a large number refer to the action of the court in overruling special exceptions to appellees' answer. A group of assignments on this ruling on special exceptions are directed to that portion of appellees' answer which, in various ways, plead the illegality of the contracts and are disposed of in the preceding discussion of this very subject. We shall dismiss all of these assignments, with reference to the ruling on special exceptions, with the statement that the issues in this case are simple. They arise out of a suit by appellant for earned commissions, alleged to be withheld by the Miller Company, damages for a breach by the Miller Company of two alleged contracts, and damages against Miller for alleged wrongful acts and conduct on his part, causing the Miller Company to commit such breach. Appellees' defenses consist of a denial of the withholding of any commissions legally due appellant, a denial of the existence of the second alleged contract, a denial of a breach of the September contract, and a denial of any wrongful acts by Miller; also, a cross-action against appellant to recover alleged overpayment of commissions; also, affirmative allegations that the Finance Company breached the September contract by voluntarily abandoning same before completion, for which reason no suit could be maintained by the Finance Company on such contract. In view of another trial, we suggest the court should rule on special exceptions so as to hold the issues attempted to be made by the pleadings to those above announced.

The Miller Company's cross-action is based on the claim that it was compelled to repay to various purchasers of stock from the Finance Company the sum of $13,470, because of misrepresentations made by salesmen of the Finance Company to such purchasers. This claim is alleged in general terms without specifying the names of the purchasers to whom the several payments are alleged to have been made, nor the specific item paid to each purchaser. The exception directed to this pleading should have been sustained; however, after the case had been on trial for about three days, the Miller Company filed a trial amendment, in which it undertook to itemize the various items making up said

amount, and to name the recipient of each item. This cured the error of the court in so far as the exception applied to the general language alleging this cross-action. But the pleading, both in the answer and the trial amendment, was defective, in that, under the written contract and under the contract the Finance Company made with these and all other purchasers of stock, the stock was sold as the stock of the Finance Company and it alone was to be responsible to the purchasers for any claim of the character alleged in the cross-action. We do not hold that, under the construction we have given this contract, the Miller Company might not be ultimately responsible for this claim of misrepresentation in the sale of the stock, but we do hold that the Finance Company was primarily responsible, and before the Miller Company should voluntarily step in its shoes and adjust the claim, it should have presented the matter to the Finance Company for adjustment. This action was contemplated by the contract, and the Miller Company should have referred the claim to the Finance Company for adjustment, and such reference was a necessary predicate to recover from the Finance Company any amount paid by the Miller Company in the adjustment of such a claim. The Finance Company was acquainted with all of the facts in reference to such claim and should have been given an opportunity to pass thereon before the Miller Company voluntarily settled with the purchaser. A special exception was directed to the deficiency of the allegation in this respect, and it was error to overrule same. The jury, however, found in favor of appellant on the cross-action and thus rendered this error harmless, and this holding is made to govern the trial court on another trial of the case.

■ A number of assignments are made on the ruling of the court on appellant's exception to the manner in which the issues were submitted to the jury. We are not disposed to hold that the trial court violated its discretion in its manner of framing the special issues, but would suggest, in view of another trial, that appellant, as plaintiff in the case, has the right to an affirmative submission of each of the material ultimate issues of fact made by the pleading and evidence, rather than a negative submission. The same rule applies to appellees' affirmative defensive issues.

We are of opinion that the assignments of error challenging the sufficiency of the evidence to sustain the finding of the jury, in answer to special issue No. 1, that the Miller Company was due appellant only the sum of $1,063.93, on commissions on the sale of stock under the September contract must be sustained. Under our view of the case, there is no substantial dispute in the evidence that a much larger sum was due and owing to appellant by the Miller Company under consummated sales of stock while the Finance Com-

pany was operating under the September contract. Under the state of the evidence produced at the trial of the case, the court would have been warranted in giving peremptory instructions in favor of appellant in the sum of $10,392.52. We do not feel authorized to render judgment in favor of appellant for this amount, for the reason that the affidavit of a former employee of the Finance Company, introduced in evidence on the motion for rehearing, if sustained by evidence in another trial, shows that this amount should be reduced by a material sum.

■ Error is assigned because of the admission in evidence, over appellant's timely and proper objection, of a pencil note signed by H. M. Rogers. This note reads as follows:

"Mr. Miller: Jones says you are sore at both of us about the addition to the Ad. I don't want you to be sore at me for you know Coleman handled and wrote the ads and if a change was made, I did not know it.
                                    "H. M. Rogers."

It will be remembered that Rogers and appellant constituted the copartnership operating under the name of the Textile Finance Company; that Coleman and Rogers, as joint plaintiffs, filed this suit; that subsequent to the filing of the suit Rogers' claim for damages and for money owing him was settled by him with the Miller Company by his receiving payment in the sum of $5,000, and further promising to pay any further amount that might be determined was due him from an audit of the business of the Finance Company with the Miller Company. The evidence shows indisputably that, after such settlement was made, he became unfriendly to appellant's suit and gave his deposition, filed at the beginning of the trial, favorable to appellees' contentions. It will be remembered also that the issue as to whether a second contract was entered into with the Finance Company for the sale of a large number of shares of the new issue of stock under an amendment of the charter of the Miller Company, increasing its capital stock to $6,000,000, was a sharply contested issue in the trial of this case; that appellant testified directly that such oral contract was entered into; that Miller positively testified that no such contract was entered into; that appellant relied on certain newspaper advertisements, claimed to have been approved by Miller, as conclusive corroboration of his claim that such contract was made; that Miller, in his testimony, claimed that the advertisements, when approved by him, did not contain any such corroborating matter, but that the advertisements had been changed before appearing in the newspapers, and the corroborating matter inserted by the change. So the contested fact as to whether Miller approved the contract as it appeared became a very material issue to be determined by the jury. Nowhere in the deposition of Rogers is there any reference, by either question or answer to

the existence of this note. It is disclosed further that the whereabouts of Rogers was unknown to appellant at the time this evidence was offered. The effect of this evidence, received over appellant's objection, was to disprove appellant's contention that the advertisement was not changed after Miller had approved it, and to establish the contention of Miller that it was changed after such approval. On evidence as material as this, given by a witness unfriendly to him', appellant had the right of cross-examination, and its admission over the objection of appellant constitutes, in our opinion, reversible error.

■■ Error has been assigned on argument of counsel for appellees, on the ground that such argument was "inflammatory, prejudicial, and not justified by the record, and was calculated to influence and prejudice the jury against the plaintiff." Objection to the court was made to this argument, but the court permitted the argument to proceed and thereby overruled the objection. The argument is as follows: "The plaintiff, Mr. Coleman, has been referred to by counsel as a stock salesman. He is not a stock salesman; it would be an honor to him to call him a stock salesman. The evidence in this case shows that he did not sell any stock but sat in a swivel chair while other men sold the stock, and his profit in it was $54,000. He is not a stock salesman, but is a kid-glove, patent leather, spat-wearing parasite. The evidence shows that this money was gathered from the taxpayers in Texas by obtaining lists from the Tax Assessors of the various counties over the State, and these taxpayers were selected as the purchasers of that stock, and that money was gathered from the tax-payers of Texas by selling them this stock, and after Coleman had acquired this money he took it from the State of Texas to Hollywood, Calif., reaping the benefits from other men's labors. The evidence shows that he sued Roy Johnston in California and recovered a judgment against him. He is not a stock salesman; he is a professional litigant, and prefers to extort money by law suits rather than earning an honest living, and he expects a Texas jury to put his hand in the pocket of the C. R. Miller Manufacturing Company and take out a large sum of money gathered from the tax-payers of Texas so that he can take it with him to his home in California."

There is nothing in the record to warrant or justify the severe strictures made by counsel against appellant, the opposing litigant in this case. It could furnish no aid to the jury in determining any contested issue, and its only purpose could have been to prejudice appellant in the minds of the jury, with the result of creating also a prejudice against his cause of action. Opposing counsel should be allowed great latitude in criticizing testimony of witnesses, as well as the manner in which a witness gives his testimony; but such liberty should never be extended to permit counsel to indulge in the character of personal abuse and criticism of a litigant, as was done by the argument here under review. If allowed, the tendency of such an argument would inevitably be to divert the minds of the jury from the issues in the cause of action on trial, and thereby result in a trial of a party to the litigation, rather than a trial of his cause of action. In our opinion, the only question to be determined on this assignment of error is: Did injury result to appellant because of such argument? The issues of the case were sharply contested by the evidence, appellant being the main witness in his own behalf. The result of the finding of the jury on these issues shows a strong probability that they were influenced by this inflammatory argument. As we have seen, a finding was made against appellant without sufficient evidence to sustain it, and almost every contested issue was decided in favor of appellees. Under such state of the record, this assignment of error is sustained. District Court Rules 39, 41; Willis v. McNeill Bros., 57 Tex. 465; Prather v. McClelland (Tex. Civ. App.) 26 S. W. 658; Railway Co. v. Greenlee, 70 Tex. 553, 8 S. W. 129; Willis & Bros. v. Lowry, 66 Tex. 540, 2 S. W. 449.

We have painstakingly gone over the very voluminous briefs filed by both appellant and appellees, with the result that, on the grounds stated, we believe this case should be reversed and remanded for a new trial. The assignments of error, as well as cross-assignments of error, not herein specifically referred to, have been examined and are overruled.

Reversed and remanded.

LOONEY, J. (dissenting). Under my view of the law, hereinafter stated, appellant was not entitled to recover in any event; but if in this I am mistaken, I agree that the case was properly reversed and remanded, because the evidence shows a much larger sum of money was due appellant than the jury found in his favor. However, I cannot agree that the case should have been reversed on either of the other two grounds mentioned by the majority, and, while not essential to the disposition of the case, I deem it not out of place to briefly express my views on these grounds.

The majority, for reasons stated, held that the trial court committed reversible error in admitting, over appellant's objection, a pencil note written by H. M. Rogers, one of the plaintiffs, to Mr. Miller, manager of the Miller Company. The main fact under inquiry, to which this pencil note was considered pertinent, was whether Textile Finance Company, the partnership composed of Coleman and Rogers, made a verbal contract with Miller Company to sell a large number of its shares of the second increase of its stock; this fact was affirmed by Coleman, but denied by Miller. Coleman contended that certain language contained in advertisements, approved by Mr. Miller before publication, cor-

roborated his contention; Miller, on the other hand, contended that the advertisements approved by him were changed, and that he had not authorized the objectionable matter that appeared therein. This controversy arose during the progress of the business between the Finance Company and Miller Company, before Rogers and Coleman dissolved partnership, several months before this suit was filed, and it was with reference to this controversy that Rogers wrote Miller the note in question, as follows:

"Mr. Miller: Jones (auditor for Miller Company) says you are sore at both of us (meaning Coleman and himself) about the addition to the ad. I don't want you to be sore at me for you know Coleman handled and wrote the ads and if a change was made I didn't know it.

"[Signed] H. M. Rogers."

Appellant's objection was that the note was written without his knowledge, that he had no opportunity to cross-examine Rogers in regard to the matter; in other words, the objection, in effect, was that the note was hearsay.

The note written by Rogers, a member of the firm, in regard to a live business controversy with Miller Company, was clearly a matter within the field of immediate inquiry, and was, in my opinion, admissible under the res gestæ rule. 22 C. J. 443, § 535; Smith v. Farmers' State Bank (Tex. Civ. App.) 262 S. W. 835–837; Sherrod v. City National Bank (Tex. Civ. App.) 294 S. W. 295–297; Farmers Mill, etc., Co. v. Hodges (Tex. Com. App.) 260 S. W. 166; Haskell v. Merrill (Tex. Civ. App.) 242 S. W. 331–335.

But even if the court erred in admitting the note, no harm to appellant resulted, for nothing was admitted or affirmed by Rogers, except to say that, if advertisements were changed, it was done without his knowledge. The probative value of the evidence was, in my opinion, negligible and of no materiality.

The majority also found reversible error in the refusal of the court to grant a new trial on the argument of counsel for appellee. The language objected to is fully set out in the majority opinion, with reference to which the majority say that there is nothing in the record to warrant or justify the strictures against Coleman.

District court rule No. 39 provides that: " * * * Counsel shall be required to confine the argument strictly to the evidence and to the arguments of opposing counsel. * * * "

From this it seems that, so long as counsel confines his argument to the evidence, the rule will not be infringed. Where inflammatory language was used, based entirely on foreign matter, the Supreme Court, in Willis v. McNeill, 57 Tex. 465–476, said: "The argument of counsel, complained of in the present case, did not legitimately belong to any proper issue in the case; was not based upon any evidence adduced, or which could have been properly adduced on the trial, and was calculated to inflame the passions and excite the prejudices of the jury."

To the same effect, see Prather v. McClelland (Tex. Civ. App.) 26 S. W. 657. But where the argument objected to was based on evidence, the Supreme Court, in Mayer v. Duke, 72 Tex. 445–454, 10 S. W. 565, 570, used this language: "The offensive words related to no facts outside of the record. They were merely epithets applied to the principal defendants, and, though highly improper, being, like all other epithets, weak as arguments, are not to be presumed to have influenced the minds of the jury."

From these expressions, it is clear that the rule of court, with reference to argument of counsel, is not violated so long as it is confined to evidence.

I do not agree that there is nothing in the record that justified the remarks of counsel; on the contrary, I think they were justified both by evidence and the circumstances in which they were made.

As to the facts, counsel, in the argument referring to the suggestion that Coleman was a stock salesman, ridiculed the idea, stating that he did not sell any stock, but sat in a swivel chair, while other men sold stock, from which he reaped a profit of $54,000; that he was not a stock salesman, but a "kid-gloved, patent-leather, spat-wearing parasite." The evidence was to the effect that stock sold by Textile Finance Company, from which Coleman derived a profit of $54,000, was through stock salesmen; that throughout the progress of the stock-selling business, Coleman was employed in the office of his firm in the city of Dallas. The only remark that can be considered denunciatory was in calling him a parasite, but in the connection used the epithet implied nothing immoral or dishonorable, and meant nothing more than that Coleman depended upon and reaped a profit from labors of other men. Counsel also said that the money made by Coleman was gathered from taxpayers of Texas, and that he took the money to Hollywood, Cal. The facts are, before the Textile Finance Company put on the sale of stock, as a preparatory measure for the campaign, they procured lists of taxpayers from different tax assessors, and that after the campaign was over, Coleman did go to his home in California. The statement that Coleman was a professional litigant, and preferred to extort money by lawsuits rather than by earning an honest living, finds some basis in appellant's prosecution of the present suit, and the one brought by him against Roy Johnson, one of his stock salesmen, after his return to California. The statement that Coleman expected a jury to put his hand in the pocket of Miller Company and take out a large sum

of money, etc., is purely figurative, and just another way of saying that he expected the jury to give him a large verdict. While some of the remarks of counsel are rather caustic, it cannot be correctly said that they were not based upon a substratum of evidence, and in my opinion the remarks were fairly inferable from the facts and circumstances, and within the meaning and spirit of the rule. Argument is the professional weapon of the lawyer, when freely and intelligently used, hidden and obscured things are exposed to the light of reason, and so long as confined to evidence, the advocate should be accorded latitude of expression and given free reign to employ his imagination and genius for advocacy. I am not in favor of any rule that, in effect, puts the lawyer in a strait-jacket while arguing the facts of his case, or that would curtail the freedom of discussion, for fear some appellate court may say thus far and no further you should have gone in your comments on the evidence. It is only when the lawyer wanders entirely out of the record, that the rule is violated, but when fairly based on evidence, it can never be correctly said, legally speaking, that the argument is prejudicial. This doctrine is enunciated in 2 R. C. L. 427, § 26, as follows: "Hence it is the rule that what is proven by direct testimony or is fairly inferable from facts and circumstances proved, and which has a bearing upon the issues, may be fair subject for comment by counsel, and if such deductions or inferences tend to fix upon a defendant the wickedness or the crime charged against him, it is within the scope of proper and fair argument to denounce him accordingly."

But even if it be true that the language used by counsel was inflammatory, and not justified by the evidence, it was, in my opinion, a justifiable retaliation for repeated denunciatory allegations in the pleadings of appellant, with reference to Mr. Miller. Miller, as head of the Miller Company, with whom Coleman and Rogers had all of their dealings, bore the full brunt of all charges of fraud and wrongdoing brought by plaintiffs against defendants. Referring to a contract Miller Company had with a Mr. Silvers for the sale of its stock, alleged to have been violated by the company, plaintiff charged that: "Silvers complained to the said C. R. Miller of his ruthless disregard of the right of the said Silvers, who refused to acquiesce in the high-handed and arbitrary action of said Miller." Again, after alleging that plaintiff had sold, under their contract, a large amount of stock, had paid Miller Company a large sum of money, that Miller, "without cause or justification * * * arbitrarily, dishonestly and corruptly, seeking to prevent these plaintiffs from further performing same," sought to abrogate the contract; and, further, that "said C. R. Miller has withheld and is now withholding and seeking through fabrication,

fraud, falsehood, and misrepresentations to appropriate to himself, and the use and benefit of the said C. R. Miller Manufacturing Company, $41,375 fund which he has in his hand, belonging to these plaintiffs, and as to which there exists no lawful or honest claim on his behalf"; that plaintiffs had at all times been willing and ready to perform the contract, and "but for the high-handed and arbitrary violation thereof by the said C. R. Miller, acting individually and as president, etc., they would have performed the contract to a finality * * * that had the said C. R. Miller Manufacturing Company continued to comply with the terms thereof instead of violating said contract and undertaking through fabrication, fraud and chicanery to deprive these plaintiffs of the benefit of the work they had perfected through their advertising, organization, etc.," they would have completed the contract and reaped a profit on an average of $12.50 per share.

Defendants leveled special exceptions at this denunciatory language, but were overruled by the court, and, of course, the pleadings containing the allegations were read to the jury.

The language used by counsel in regard to Coleman is much milder than the charges against Miller of ruthless, high-handed methods, of dishonesty, fabrication, falsehood, misrepresentation, and chicanery. Appellees, in the only proper way, by special exceptions, sought to have the denunciatory allegations eliminated and expunged from the record, but were overruled; the allegations therefore reached the jury, resulting in such prejudice to defendants as might reasonably be expected to flow from such strong language. In this situation, I think retaliation was justifiable.

It is generally held that improper argument is not ground for reversal where the language used is provoked by remarks of counsel for the adverse party. Where inflammatory language in a pleading gets to the ears of the jury, it is certainly as detrimental and prejudicial as if spoken by counsel in argument; therefore, if in one instance retaliation in kind is condoned, there exists no good reason why condemnation in the other instance should be visited. This proposition is well sustained by the following authorities: San Antonio, etc., Co. v. Barnett, 12 Tex. Civ. App. 321, 34 S. W. 139; St. Louis, etc., Co. v. Daughtery (Tex. Civ. App.) 31 S. W. 705; Willis v. McNatt, 75 Tex. 69, 12 S. W. 478–482; Belknap v. Groover (Tex. Civ. App.) 56 S. W. 249–252; I. & G. N. Ry. Co. v. Goswick (Tex. Civ. App.) 83 S. W. 423–425; St. Louis, etc., Co. v. Granger (Tex. Civ. App.) 100 S. W. 987–989; Paschal v. Owen, 77 Tex. 583–587, 14 S. W. 203.

The material points involved in my dissent, however, are these: I am of opinion that the contract of September 19, 1924, under which the parties operated, was utterly void, because entered into in violation of the Blue

Sky Law of this state, and also in utter disregard of the terms, conditions, and stipulations under which Miller Company was authorized to sell its stock, as shown by the permit or authority issued by the secretary of state. But even if the contract was valid and not subject to these objections, appellant did not show himself entitled to recover, because the jury found that plaintiffs were themselves at fault in violating the contract without valid excuse.

These propositions will be discussed in the order named; but, before entering upon the discussion, I will notice a finding of fact stated in the majority opinion, which I respectfully submit is not supported by the record. This finding is to the effect that Miller Company was chartered in 1919 and had been a solvent going concern during all of this time. If this finding is intended as a substitute for, or in lieu of, the finding the statute requires the secretary of state to make and enter of record, as a basis for the exemption of the concern from the general requirements of the Blue Sky Law, then I insist that it cannot be so considered.

Article 588, Rev. St. 1925, provides that: "Any concern which has been a solvent going concern for a period of two years next preceding the date of any application named in this article, may submit to the Secretary of State satisfactory evidence of such fact and of its present sound solvent condition; whereupon the Secretary of State shall consider the same and shall require such further evidence, and may make such independent investigation as he may deem proper, concerning such matter. If upon full consideration thereof he shall conclude that such concern has been a solvent going concern for a period of two years and is at present solvent, he shall enter such finding upon his record, whereupon the proposed issue and sale of such stock, debentures or other securities, as defined in this title, of such concern, shall be exempt from the general requirements of this title."

No issue was made by the pleadings as to the solvency of Miller Company at the time the application was made to the secretary of state for authority to sell its stock, nor as to its solvency during the two preceding years, no such issue was submitted to the jury, and the record, in my opinion, will be searched in vain for any direct evidence on the question. That the company had been for more than two years, and was at the time the application was made, a going concern, is beyond dispute, but that it had been for two years and was then solvent can only be arrived at by conjecture; therefore, as the record fails to disclose any finding or record by the secretary of state as to its solvency, it could not be and was not exempt from the general requirements of the Blue Sky Law. But even if the finding by the majority, as to the solvency of Miller Company, was justified by evidence, such finding cannot substitute for the finding the law requires shall be made by the secretary of state, and in this way validate contracts and acts entered into and accomplished in flagrant violation of law.

The Blue Sky Law, articles 579 to 600, inclusive, Rev. St. 1925, requires all concerns desiring to sell capital stock, either of original or subsequent issue, to file in the office of the secretary of state an application for a permit to do so, accompanied, among other things, by a copy of its articles of association, copies of stock certificates, statement as to the amount of its capital stock, its par value, the price at which it is to be sold, the amount of commissions to be paid agents for sales, and a detailed statement showing assets and liabilities, with a profit and loss statement. But such concern, on proper showing to and a finding by the secretary of state, entered of record, to the effect that it is then and has been a solvent going concern for a period of two years next preceding the application, shall be exempt from the general provisions of the law. It is obvious, however, that an application to the secretary of state for authority to sell stock, on conditions named in the law, is one thing, whilst an application under article 588, setting up facts justifying an exemption, is another and an entirely different thing. The majority hold that the authority issued by the secretary of state to Miller Company, to sell stock on terms and conditions named, exempted the company from the general requirements of the law, and on this theory sustained the validity of the contract. From this view I dissent; the contents of the document issued by the secretary of state, and not the style or name written upon it, will determine what it is and its legal effect. The secretary of state made no finding or record whatever to the effect that Miller Company was, at the time the application was made and had been for the two prior years, a solvent going concern, as the law requires shall be done as the basis for exemption, but, on the contrary, the document issued by the secretary of state, styled exemption, specifically required Miller Company to sell stock at its par value of $100 per share, to pay no agent's commissions for sales, stipulating that all expenses incident to sales should not exceed 5 per cent. of the sale price, and provided that the business should be conducted in all things in accordance with the Constitution and laws of the state, and the "Blue Sky Law thereof."

It seems rather incongruous to say that Miller Company, in selling stock, was exempt from the observance of the general requirements of the Blue Sky Law, under a document issued by the secretary of state that required the company, in all things, to observe the provisions of the law. This cannot be, for it cannot be both exempt from the provisions of the law, and at the same time required to observe its provisions. The document is just what its contents proclaim it to

be; that is, a permit to sell stock, on terms and conditions, not exempt from, but in accordance with, the provisions of the law.

Furthermore, the document cannot be given the legal effect of an exemption, for the simple reason that the secretary of state is not authorized by law to grant exemptions. The statute is specific, his only duty is to hear the application and proof, and if, after full consideration, he finds that the concern is at the time solvent and has been for the period of two years next preceding, he shall enter such finding on his record, whereupon the law, not the secretary of state, speaks and declares that the proposed issue and sale of such stock, debentures, or other securities shall be exempt from the general requirements of the law.

It may be contended, however, that, because the secretary of state styled the document issued by him an exemption from the general requirements of the Blue Sky Law, the presumption will be indulged that he performed his legal duty, and found and entered of record the necessary facts justifying an exemption in favor of the company.

The general rule is that a presumption will always be indulged to the effect that official acts or duties have been properly performed and, in general, that everything done by an official, in connection with the performance of an official act in the line of duty, was legally done; but this presumption relates only to official acts done in the routine of official business, and will not be indulged when the acts of the official are outside the duties of his office. Speaking to this point, in Jones v. Muisbach, 26 Tex. 235, 237, Judge Moore, for our Supreme Court, said: "But this presumption can never be invoked to sustain the acts of an officer outside of, or contrary to the usual and well recognized functions and duties of his office. To do so would be to withdraw the acts of such officers entirely from legal scrutiny, and constitute their own sense of duty as the sole criterion of their powers; and would, in all probability, sanction every usurpation of which such an officer might have been guilty. In fact, the more gross the usurpation, the more difficult would it be for those who should deny the validity of the act to show that he had been forbidden to perform it by superior authority. The correct rule, as recognized by this and every other court, unquestionably is, that where an officer of well known, defined and limited powers, performs an act at variance with or beyond the scope of his usual authority, the burden of proving its validity rests upon the party seeking to sustain it. Otherwise, the party seeking to overthrow such a presumption would be forced to prove a negative."

Also see Houston v. Perry, 3 Tex. 390–395; Ford v. Dilley, 174 Iowa, 243, 156 N. W. 513–527; Fouke v. Jackson County, 84 Iowa, 616, 51 N. W. 71–73. For these reasons, I am of opinion that the Miller Company was not exempt from the general requirements of the Blue Sky Law, but was required to comply in all things with its provisions. One of its provisions (article 583) is that: "* * * Commissions for the sale of stock and other securities, promotion, and all other incidental expenses shall not, in the aggregate, exceed twenty per cent. of the price at which the stock or other securities are to be sold, as shown by the application or amended application." It is perfectly obvious that this provision of the statute was violated, as well as the express stipulations and conditions of the permit issued by the secretary of state, to the effect that the stock should be sold at its par value, of $100 per share; that no commissions should be paid for the sale thereof; and that all expenses should not exceed 5 per cent. of the sales price.

Under the sales contract the parties (plaintiffs and defendant) made, plaintiffs undertook to sell, and did sell to the public, the common stock of Miller Company at $130 per share, $30 in excess of its par value and $30 in excess of the price at which the company was authorized by the secretary of state to sell; that the company agreed to allow and did allow plaintiffs, as sales agents, $30 commissions (or profit, it is immaterial which) for each share of stock sold—all this in plain violation of both the civil and criminal statutes of the state, and in utter disregard of the terms stipulated and conditions of the permit issued by the secretary of state.

The very thing the Blue Sky Law was designed to prevent, that is, imposition on the unwary public in the sale of stocks, was accomplished in this case. It is a matter of common knowledge that citizens of this state, chiefly those of moderate means, had been shamefully imposed upon by unscrupulous promoters in the sale of stocks, as devoid of real value as the blue sky above. The average small investor knows little, if anything, in regard to commercial ratings, and in the nature of the case cannot afford the expense of an audit before investing, hence is unable to deal at arm's length with skilled stock salesmen.

It is also quite apparent that those promoting the increase of the capital stock of Miller Company secured the secretary of state's approval of the charter amendment, authorizing the increase of capital, also the issuance by said official of the permit or authority for marketing same, by false representations and deceit; and that the parties to this suit entered into an arrangement for the sale of the stock in violation of law, and in utter disregard of the restrictions and conditions of the permit.

These conclusions are based on the following undisputed facts: The original contract between the parties, of date September 19, 1924, was in form a subscription or purchase

contract by Rogers and Coleman for 14,250 shares of the capital stock of Miller Company, at $100 per share, payable $75,000 cash, the balance on or before July 1, 1925; but this form was in fact a cover for an illegal arrangement entered into by the parties for the sale of stock on a commission basis. The real agreement, that is, the sales agreement, was not disclosed in the writings, but rested in parol, until after the parties successfully passed the secretary of state, and thereupon Miller wrote plaintiffs the letter of October 2, 1924, in which he expressed the pith of the understanding under which the parties acted, as follows: "You are to sell your stock in said company at $130.00 per share, paying C. R. Miller Manufacturing Company for it $100.00 per share, which gives you a profit on the transaction of $30.00 per share."

On September 22, 1924, there was filed in the office of the secretary of state the proposed amendment to the charter of Miller Company, increasing its capital stock from $1,750,000 to $3,250,000, divided into 32,500 shares of the par value of $100 each; the proposal was supported by the affidavit of proponents, to the effect that 50 per cent. of the amount of the increased capital stock had been in good faith subscribed, and $150,000 paid in cash; that H. M. Rogers and F. W. Coleman of Dallas, doing business as copartners under the firm name of Textile Finance Company, had subscribed for 6,750 shares of the stock and had paid in $75,000 in cash; and that C. R. Miller had subscribed for 750 shares of the stock and had paid in $75,000 in cash. As a matter of fact, Rogers and Miller had not subscribed for a single share of the stock, but had with the company an undisclosed agreement for the sale of stock on a commission basis; they had not paid a single dollar in cash, and have never paid a penny of the $75,000, alleged to have been paid in cash. On the same day, September 22, 1924, Miller Company made application to the secretary of state, and was granted authority (permit or exemption, the name is immaterial) by said official, to issue and sell 15,000 shares of its authorized increase at the par value of $100 per share; no commissions were to be paid for the sales, and all other expenses should not exceed 5 per cent. upon the sales price, and sales were to be conducted in all things in accordance with the laws of the state. In violation of the law, and in utter disregard of restrictions of the permit, the parties carried out an arrangement under which stock was sold to the public at $130 per share, on a commission of $30 for each share sold.

In view of these undisputed facts, the parties, in my opinion, are in pari delicto, and neither should be aided by a court to enforce, or to reap the profits of, such an illegal arrangement, but should be left where they are found. See 13 C. J. 493, § 440; Beer v. Landman, 88 Tex. 450–453, 31 S. W. 805;

Sceligson v. Lewis, 65 Tex. 215, 57 Am. Rep. 593; Reed v. Brewer, 90 Tex. 144, 37 S. W. 418; Dallas Brewery v. Holmes Bros., 51 Tex. Civ. App. 514, 112 S. W. 122.

In Beer v. Landman, supra, the doctrine here invoked was announced by our Supreme Court in the following language: "Where two persons guilty of participation in an unlawful transaction are in pari delicto, as in this case, neither a court of law nor a court of equity will aid either to recover or reinvest himself with any title or interest which he, in consideration of such unlawful contract, has vested in the other, but will leave them in the same condition as to vested interests as they, by their own acts, have placed themselves."

On the assumption, however, that the contract sued upon was and is in all respects legal and valid, still I am of opinion that plaintiffs were not entitled to recover, and that the request of appellees for an instructed verdict should have been given, for this reason, it affirmatively appears that plaintiffs failed without a valid, excuse, to perform the contract sued upon.

This suit was based on the idea that, without fault on their part, plaintiffs were prevented, by the wrongful conduct of defendants, from completing certain contracts for the sale of stock and from earning profits incident thereto; also, that defendants were wrongfully withholding certain profits already earned by plaintiffs on consummated sales of stock.

The jury found against plaintiffs on all material issues, that is, that defendants were not at fault and did not prevent plaintiffs from completing the contract; that plaintiffs without excuse, abandoned the contract and left it unfinished.

In the contract sued upon, plaintiffs agreed to pay defendant, on or before July 1, 1925, $1,425,000, being $100 per share for the stock plaintiffs had either subscribed for or contracted to sell (it being immaterial which, considered in this connection), and defendant was given the right under the contract to hold all money and notes turned over by plaintiffs, for the faithful performance of the contract, until the full sum of $1,425,000 was paid.

The general rule of law, applicable here, was tersely stated by the court in Davis v. Yates, 1 White & W. Civ. Cas. Ct. App. § 265, to the effect that one who refuses or fails to perform the conditions imposed on him by the terms of the contract, and shows no excuse for such refusal or failure, cannot recover. This doctrine precisely states the predicament of plaintiffs according to the findings of the jury. I am of opinion, therefore, that plaintiffs were not entitled to recover, because the contract sued upon was void, but, if valid, plaintiffs were not entitled to recover, because, without excuse, they failed to perform but abandoned same.